UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

DARRYL PRICE WRIGHT,                            :
                                                :  **MEMORANDUM DECISION AND**
                             Plaintiff,          :  **ORDER**
                                                :
            - against -                          :  21-cv-6451 (BMC)
                                                :
                                                :
JET LINX AVIATION, LLC,                         :
                                                :
                             Defendant.          :
                                                :
-------------------------------------------------------- X

**COGAN**, District Judge.

　　Plaintiff brings this action under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*[1]  Defendant Jet Linx Aviation has moved for summary judgment.  Plaintiff's theory of the case, both in the complaint and in opposing the motion, is opaque.  It appears that plaintiff is complaining about two events: (1) while he was out under Jet Linx's medical leave policy (not FMLA leave, his FMLA leave having been exhausted), Jet Linx improperly hired someone else for his job; and (2) Jet Linx compelled him to take a pay cut shortly after he returned from a second FMLA leave.  There is no issue that plaintiff received exactly what he was entitled to under the FMLA and no admissible evidence that his employer forced him to take a lower paying job.  Jet Linx's motion is therefore granted.

**BACKGROUND**

　　Plaintiff has not contested Jet Linx's statement of undisputed facts under Local Rule 56.1; those facts are therefore deemed admitted.

---

[1] Plaintiff also originally brought an action under the Age Discrimination and Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, but the Court previously dismissed that as untimely.

Jet Linx is a private airline company with multiple locations across the United States.  It hired plaintiff for the position of Pilot in Command ("PIC") on May 8, 2017 at an annual salary of $130,000.  Plaintiff lives in North Carolina.

In October 2019, after returning from about 8.8 weeks of FMLA leave (the FMLA provides for 12 weeks leave for every 12-month period), Jet Linx assigned plaintiff to work out of its Fort Worth, Texas base.  That was within Jet Linx's rights under its employment contract with plaintiff and is not challenged here; Jet Linx can base its pilots wherever it chooses.  What that meant, however, was that plaintiff had to absorb his own airfare and costs to live at a hotel in Fort Worth and travel between North Carolina and his base in Fort Worth.  The hotel costs alone for doing that came out to about $900 per month, or $10,800 per year.

On October 18, 2019, shortly after plaintiff returned to work, the Federal Aviation Administration suspended plaintiff's medical clearance to fly.  That had nothing to do with Jet Linx except, of course, it couldn't allow him to fly.  On October 27, 2019, plaintiff requested more leave because of the FAA's refusal to clear him medically.  Eleven days later, on November 7, 2019, Jet Linx's HR Director advised plaintiff that he still had more FMLA leave left over.  She sent him the forms so he could submit them, but he never did.  Nevertheless, she approved FMLA leave retroactive to October 24, 2019, and while on leave, plaintiff received full salary and benefits.

The remaining part of plaintiff's FMLA leave ran out on November 27, 2019.  At that point, Jet Linx's HR Director advised plaintiff that Jet Linx would approve his transition to Medical Leave.

Medical Leave is a written policy through which Jet Linx, for selected employees, can extend their employment even though they can no longer return to work medically and have run

out of FMLA leave.  In addition to being offered at Jet Linx's discretion, Medical Leave, unlike FMLA leave, was unpaid, and importantly, it did not have job protection.  Like FMLA leave, it also required medical support from a physician as to the reason for the medical disability and expected return date to work.  Plaintiff, again, submitted neither.  Nevertheless, Jet Linx elected to place plaintiff on Medical Leave.  This allowed him to maintain his formal status as an employee.  (Perhaps he was able to maintain benefits even though he did not have a salary; this is unclear.)

However, being down a functioning pilot during its busiest season (the Christmas through New Year holiday season), Jet Linx had hired another pilot on December 17, 2019, while plaintiff was out on Medical Leave.  Recall that at that time, plaintiff had used up his FMLA leave and was still not medically cleared to fly by the FAA.

Jet Linx kept plaintiff on Medical Leave through January 23, 2020.  At that point, a new 12-month period began for purposes of FMLA leave and Jet Linx returned him to FMLA leave with his $130,000 salary and benefits as of January 24, 2020.  However, he still could not fly because the FAA had not cleared him medically.

He was on FMLA leave for just a few weeks, until February 12, 2020, at which time the FAA found him medically fit to fly, allowing him to resume full duties as a PIC.  However, because Jet Linx had filled plaintiff's position while he was on Medical Leave (not FMLA leave), it had no open position at any of its bases.  It nevertheless carried plaintiff as a fully qualified PIC and paid him his full salary and benefits until something opened up.

For the next six weeks, plaintiff and Jet Linx worked together to try to find a PIC position for him.  He eventually accepted a similar position, also a PIC position – but this one classified

3

as a "floater."  It paid $15,000 less than the non-floater PIC position he had before and required the same medical clearance and license.

The difference is that a floater PIC is not assigned to any base station and a non-floater PIC is.  This meant that, although plaintiff's salary was reduced, he was able to save about $900 per month in hotel costs plus additional travel costs.  He could stay at his house in North Carolina and if Jet Linx wanted him to work somewhere, it had to pay for him to get there.

## DISCUSSION

The FMLA requires covered employers to provide 12 weeks of paid leave for any 12-month period of employment if an employee has a "serious health condition."  29 U.S.C. § 2612(a)(1)(D).  If the health condition resolves while the employee is on FMLA leave, the employee has a right of return, either to his prior position, or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1)(B).

Jet Linx has struggled on its motion to discern whether plaintiff is asserting that it "interfered" with his FMLA rights – that is, failed to provide him with his rights – or "retaliated" against him for exercising those rights.  See Arizmendi v. Rich Products Corporation, No. 22-1971, 2023 WL 4246106 (2d Cir. June 29, 2023) (setting forth elements of both claims).  It is unclear to me too, and plaintiff's opposition papers don't help.  What seems most likely is that plaintiff is complaining that Jet Linx should not have hired someone to take his place while he was out on Medical Leave and compelled him to take a PIC-floater position for $15,000 less than his prior non-floater PIC salary.

Whether one characterizes these claims as interference with FMLA rights or retaliation for exercising them, the claims are without merit.  Starting with interference, plaintiff received

4

all the rights to which he was entitled.  He had all twelve weeks of FMLA leave for the first 12-month period and was promptly placed back on FMLA leave when his second period of eligibility began.  He has not pointed me to anything more under the FMLA with which Jet Linx should have provided him.  And Jet Linx did this even though it could have taken the position, "no medical paperwork, no leave."

As to retaliation, I cannot see what plaintiff is complaining about.  First, when Jet Linx "back-filled" his position, he was no longer on FMLA leave and there was no indication that he would ever be able to return to work.  Jet Linx did not have to hold the position open because with plaintiff having used his entire 12 weeks of FMLA leave during the preceding 12-month period, Jet Linx didn't know if plaintiff was ever going to be allowed to fly.  Jet Linx could have terminated him right then without running afoul of the FMLA because plaintiff was not qualified for his position. He had exhausted his FMLA leave, still had no permission from the FAA to fly, and Jet Linx needed a pilot who could fly.

In fact, this case is a good illustration of the adage that "no good deed goes unpunished." Jet Linx bent over backwards to extend accommodations to plaintiff and all it got in return, as the T-shirt says, was this lousy lawsuit.  As noted, when the FMLA leave expired, Jet Linx did not have to grant him leave under its discretionary Medical Leave policy.  Having used up his FMLA leave, it could have terminated him at that point.  (Again, that's putting aside the fact that Jet Linx didn't have to grant any FMLA leave or even consider Medical Leave because plaintiff did not submit the required medical documentation.)  Nevertheless, Jet Linx granted him discretionary Medical Leave which, although unpaid, maintained his status as an employee.  That act of largesse, in turn, caused a restart of his FMLA leave period.  And when that happened, Jet Linx promptly restored him to FMLA leave so that, even though he wasn't flying, he still

received his salary and benefits.  Then, once the FAA said he could fly, it promptly restored him

to his prior salary and benefits., even before it found a role for him.

That leaves us then with his complaint that his employer forced him to take a lower

paying job.  The record is undisputed the Jet Linx didn't force him to do anything.  It was

prepared to carry him at full salary for some unknown period into the future until a job opened

that he wanted to take.  And it did.  Plaintiff's testimony at his deposition on this point could not

have been any clearer:

> Q      Prior to your acceptance of the floater position, Mr. Wright, the company
> was paying you at the rate of $130,000 per year from the point in February that
> you told them that your license was back, right?
>
> A      Yes.
>
> Q      At any point between February 9th or 10th, whatever the date is, through
> the date that you accepted the floater position, did the company tell you that the
> $130,000 annual payment rate was going to be changed?
>
> A      Not while I was still employed before the acceptance of the floater
> position, no, they didn't.
>
> Q      So you were employed but you weren't working as a pilot in February,
> right?
>
> A      Correct.
>
> Q      And even though you weren't working as a pilot, the company was paying
> you at your full rate of $130,000, correct?
>
> A      Yes.
>
> Q      And at no time did the company say look, the $130,000 rate just can't
> keep going with you not working, that they're going to cut that, did they?
>
> A      No.
>
> Q      So there came a point in time where you accepted the floater position,
> correct?
>
> A      Yes.

Q       That floater position paid $115,000, correct?

A       Um-hmm.

Q       Yes?

A       That's correct.

Q       So if you were getting $130,000 from the company, sir, why did you accept the floater position at the lower rate of $115,000?

A       Because there was no other position except -- no other position offered to me that paid $130,000 with the company that I was employed with.

Q       But why didn't you keep waiting?  Why didn't you let March keep going and see what would happen with the company not forcing you to take less money?

A       Because the floater position was a floater position I could remain at home. I was willing to accept employment with the same company that I was working with -- working for, knowing that it was a floater position, and this was not going to -- okay.

Q       Finish your answer. It was not going to what?

A       It was not going to be on the Omaha XL or on the Indy XL, the old Indy XL.

Q       So basically the floater position presented certain advantages to you, correct?

A       The floater position itself did, yes, it did, an advantage over what I would have been making taking any other position for $115,000 based on an airplane having to go somewhere else.

In other words, he took the job because he wanted the job.  He didn't care that it was going to pay $15,000 less because he no longer would have to pay for hotel and airfare to get to Texas or someplace else.  He knew that had he wanted to, he could have stayed on at the same $130,000 he was making before. Nobody from Jet Linx told him otherwise.

That does not seem to me to constitute retaliation.  But in opposition to Jet Linx's summary judgment motion, plaintiff has included in his opposing affidavit an entirely different, and contradictory, reason why he took the PIC-floater job:

> In early March 2020 – I did not note the exact date – defendant Ari Sarmento contacted me and told me that a floater position had been 'created' for me at a reduced salary of $115,000 and a change in working conditions which Jet Linx has detailed in their Motion.

> I was not asked this at my deposition, but Ari Sarmento told me that taking this floater position was my "last option."

To the extent plaintiff is suggesting that he took the PIC-floater position because he had to (upon penalty of being fired), he cannot raise an issue of fact that way.  It would have been the most natural thing in the world, when he was asked at his deposition, "why did you accept the floater position at the lower rate of $115,000?" and "why didn't you keep waiting?  Why didn't you let March keep going and see what would happen with the company not forcing you to take less money?" to say, "because Ari Sarmento told me that taking this floater position was my last option," if that was what actually happened.  But he didn't say that.  Of course, saying that would also have been flatly inconsistent with his agreement that "at no time did the company say look, the $130,000 rate just can't keep going with you not working, that they're going to cut that."

It is firmly established that a party cannot contradict his deposition testimony with an affidavit to raise an issue of fact on summary judgment.  See, e.g. Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  The reasons are obvious. Affidavits in opposition are drafted in the cool and friendly confines of counsel's office. The lawyer, having had his adversary lay his case bare on the motion, can discuss with his client exactly what needs to be said to adequately respond to the motion.  This is not

to say that lawyers regularly suborn perjury, but a figment of memory can take on undue status when carefully characterized by the lawyer.

In a deposition, in contrast, the witness must respond spontaneously.  That is one reason why Wigmore called cross-examination the "greatest legal engine ever invented for the discovery of truth."  5 J. Wigmore, Evidence § 1367 (J. Chadbourn rev. 1974).  Of course, a witness may make mistakes in giving live testimony, but he is not without protection.  His lawyer prepares him (or should prepare him) in advance of the deposition on the major themes and refresh his recollection about the important conversations between the parties involved.  Moreover, if his testimony is nevertheless erroneous or incomplete at the deposition, his lawyer, who should be aware of the error, may question him.  And on top of that, the witness is given a copy of the transcript to review and sign with plenty of notice, including an errata sheet, so that he may fully contemplate whether there are any inaccuracies or omissions in his testimony that require correction.

From the record before me, it appears that plaintiff made no corrections and his attorney did not attempt to examine him at his deposition.  Jet Linx spent time and money in conducting discovery and preparing its summary judgment motion in accordance with plaintiff's deposition testimony.  Plaintiff cannot walk away from that testimony through a contradictory affidavit, especially one that is inconsistent with virtually everything else in the record.  The record stands unopposed that he took the PIC-floater position because he wanted to, not because his continued employment at $130,000 depended on it, and taking the job was not an adverse action because plaintiff took it voluntarily for his own

9

reasons.  Jet Linx therefore did not retaliate against him for having exercised his FMLA rights.[2]

Because there is no genuine issue of material fact that plaintiff took the PIC-floater position because he wanted to, I need not reach the issue of whether it was an "equivalent" position under the FMLA.  It suffices to note that plaintiff's deposition testimony showed that he certainly seemed to think so.

## CONCLUSION

Defendant's motion for summary judgment is granted.


**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.


Dated: Brooklyn, New York
          March 28, 2024


---

[2] To the extent plaintiff seeks refuge behind amended complaint – which alleges a phone call in which a Jet Linx employee told him that he would be terminated by February 15, 2020 unless the FAA restored his certification – it offers him no shelter.  See Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996) ("a plaintiff opposing summary judgment may not rely on his complaint to defeat the motion").  In any event, the FAA restored his certification before that date and he was not terminated.